**FILED**

VANESSA L ARMSTRONG, CLERK

Apr 17 2020

U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

|  |  |  |
|---|---|---|
| MARYVILLE BAPTIST CHURCH, INC., and DR. JACK ROBERTS, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. __3:20CV-278-DJH__ |
| v. | ) ) ) | |
| ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, | ) ) ) | |
| Defendant. | ) ) | |

**VERIFIED COMPLAINT**
**FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DAMAGES**

Plaintiffs, MARYVILLE BAPTIST CHURCH, INC. ("Maryville Baptist Church" or the "Church"), and DR. JACK ROBERTS ("Dr. Roberts"), sue Defendant, ANDREW BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky ("Kentucky" or the "Commonwealth"), and allege:

**NOTICE OF RELATED CASE CURRENTLY PENDING IN THIS COURT**

Pursuant to L.R. 40.1(b), Plaintiffs show the Court that a case is currently pending in this United States District Court, in the same Louisville Jury Division, involving substantial common questions of law and fact. That related case is styled *ON FIRE CHRISTIAN CENTER, INC. v. GREGG FISHER*, *et al.*, Case No. 3:20-cv-00264-JRW [hereinafter *On Fire Christian Center*]. Plaintiffs respectfully submit that these cases should be considered related under L.R. 40.1(b) both because they meet the requirements of Fed. R. Civ. P. 42(a), and because a substantial savings of judicial time and resources would result if they were handled by the same judge.

1

## URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER

1.      In their Prayer for Relief, *infra*, and in their contemporaneously filed Motion for Temporary Restraining Order (TRO), Plaintiffs seek a TRO restraining enforcement against Plaintiffs of the various COVID-19 orders issued by Governor Beshear and other Commonwealth officials purporting to prohibit Plaintiffs, on pain of criminal sanctions and mandatory, household-wide quarantines, from gathering for in-person or even "drive-in" worship services at the Church, regardless of whether Plaintiffs meet or exceed the social distancing and hygiene guidelines pursuant to which the Commonwealth disparately and discriminatorily allows so-called "life-sustaining" commercial and non-religious entities (e.g., beer, wine, and liquor stores, warehouse clubs, and supercenters) to accommodate large gatherings of persons without scrutiny or numerical limit.

2.      As shown by the verified allegations below, Governor Beshear on Good Friday specifically threatened criminal sanctions and quarantines against Easter Sunday worshippers who show up at a church, and the Governor followed through with his threat by dispatching Kentucky State Police to Maryville Baptist Church on Easter Sunday to post notices of criminal violation and quarantine requirements on all vehicles present and record their license plate numbers—both occupied and unoccupied vehicles, and whether the occupants were inside the Church building for the worship service or in their vehicles for the "drive-in" version of the service. On the Wednesday following Easter Sunday, April 15, owners of the vehicles in the Church parking lot on Easter Sunday, including Plaintiff Dr. Roberts, received letters from the Commonwealth further confirming Governor Beshear's criminal sanction and mandatory quarantine threats for Easter Sunday worshippers, and also confirming that this coming Sunday's services remain targets of Governor Beshear's enforcement threats.

3.      On the Saturday between Governor Beshear's Good Friday threats and Easter Sunday enforcement actions, however, this Court issued a TRO enjoining the Mayor of Louisville from "**enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire**." *See On Fire Christian Ctr.*, 2020 WL 1820249, *1 (W.D. Ky. Apr. 11, 2020) (emphasis added). This Court issued the Louisville TRO because the Mayor threatened the plaintiffs with criminal enforcement of Governor Beshear's COVID-19 orders. There, the Mayor said that he would "use the police to deter and disburse" religious gatherings, had requested that the police "record license plates of all vehicles in attendance," and threatened that individuals would be contacted by public health officials informing them to self-quarantine under the threat of criminal sanction. *Id.* at *4–5. This Court held that such threats and actions were unconstitutional because the government "**may not ban its citizens from worshipping**." *Id.* at *8 (emphasis added). And although the Louisville TRO was necessarily limited to the plaintiffs before the Court in the case, the Court admonished, "Louisville ought not to view the limits of this injunction as a green light to violate the religious liberty of non-parties." *Id.* at *1 n.2.

4.      Nevertheless, what the Mayor of Louisville only threatened to do to On Fire Christian Center, and this Court enjoined as unconstitutional under the First Amendment, Governor Beshear actually did to Plaintiffs, dispatching the Kentucky State Police to Maryville Baptist Church on Easter Sunday to issue notices of criminal sanctions and mandatory quarantines, and to record license plates for follow up enforcement. Given Governor Beshear's apparent disregard of this Court's Louisville TRO (i.e., the constitutional reasoning behind it), and the reality of the letters received by Plaintiffs' Easter Sunday worshippers confirming Governor Beshear's enforcement threats and intentions, Governor Beshear and the Kentucky State Police

will continue to threaten criminal sanctions and other enforcement actions against Plaintiffs and their Sunday worshippers, **including this Sunday**, absent emergency relief from the Court.

## INTRODUCTION

5.      Due to the unprecedented nature of the 2019 novel coronavirus disease (COVID-19) and the indisputable health tragedy the disease has wrought on our great Republic and those victims suffering under its yoke, there are those who may find it "tempting to hold that First Amendment rights should acquiesce to national security in this instance." *Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013). One could be forgiven for hastily reaching such a conclusion in such uncertain times, but "our Forefather Benjamin Franklin warned against such a temptation by opining that those who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." *Id.*

6.      When the great American experiment was first implemented, our revered Founders took pains to note that the Constitution—and all of the rights it recognized and enshrined—was instituted "in order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and **secure the Blessings of Liberty to ourselves and our Posterity**." U.S. Const. Pmbl. (emphasis added). To this very day, "we continue to strive toward [that] more perfect union." *Smith v. City of New Smyrna Beach*, No. 6:110cv01110-Orl-37KRS, 2013 WL 5230659, *1 (M.D. Fla. Sept. 16, 2013). That work is not easy, and governments acting in good faith can and sometimes do miss the mark. This is such a case.

7.      Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our

survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

8.       During times of national crisis, such as the current uncertainty arising from COVID-19, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

9.       It is beyond cavil that our commitment to our founding principles is most tested and best calculated during times of crisis and uncertainty. Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. **Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear**." *Hartness v. Bush*, 919 F.2d 170, 181 (D.C. Cir. 1990) (Edwards, J., dissenting) (emphasis added). Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added).

10.       In the instant matter, Plaintiffs bring this case only to highlight the troubling erosion of fundamental and cherished liberties wrought by the imposition of Defendant's orders surrounding the COVID-19 virus. Plaintiffs seek not to discredit or discard the government's

unquestionable interest in doing that task for which it was instituted – protecting the citizenry. But, as is often true in times of crisis, Plaintiffs respectfully submit that in an effort to uphold its sworn duties the Commonwealth has stepped over a line the Constitution does not permit. Because of that, Plaintiffs bring this action to ensure that this Court safeguards the cherished liberties for which so many have fought and died. For, "**[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded**." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added). Plaintiffs pray unto the Court that it not permit the cherished and fundamental liberties enshrined in the Constitution to be another tragic casualty of COVID-19.

## PARTIES

11.     Plaintiff MARYVILLE BAPTIST CHURCH, INC. (the "Church") is a non-profit corporation incorporated under the laws of the Commonwealth of Kentucky and is located at 130 Smith Lane, Louisville, Kentucky 40229.

12.     Plaintiff DR. JACK ROBERTS ("Dr. Roberts") is the Founder and Senior Pastor of Maryville Baptist Church and resides in Bullitt County, located in the Louisville Jury Division of the Western District of Kentucky.

13.     Defendant, ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky ("Kentucky" or the "Commonwealth"), is responsible for enacting and enforcing, either personally or through his designees, the COVID-19 Executive Orders and other Orders at issue in this litigation.

## JURISDICTION AND VENUE

14.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. This action also arises under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc, *et eq.* This action also

arises under Sections 1, 5, 8, and 15 of the Bill of Rights of the Kentucky Constitution. This action also arises under the Kentucky Religious Freedom Restoration Act, Ky. Rev. Stat. § 446.350.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

17.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant a temporary restraining order and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

18.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

A.     **GOVERNOR BESHEAR'S EXECUTIVE ORDERS AND RELATED CABINET FOR HEALTH AND FAMILY SERVICES ORDERS.**

19.     On March 6, 2020, in response to COVID-19, Governor Beshear issued Executive Order 2020-215, which declared a state of emergency in the Commonwealth of Kentucky. A true and correct copy of Executive Order 2020-215 is attached hereto as **EXHIBIT A** and incorporated herein.

20.     In that order, Governor Beshear stated that COVID-19 represents a "public health emergency" and directed various government agencies to implement certain restrictions and orders to facilitate the Commonwealth's response.

21.     On March 16, 2020, purporting to act under the authority of various Kentucky statutes and Executive Order 2020-215, the Cabinet for Health and Family Services issued an

7

Order permitting business establishments that offer for sale "[l]iquor, beer, and wine" to continue operations for "carry-out, delivery, and drive-thru services." A true and correct copy of the March 16, 2020 Order is attached hereto as **EXHIBIT B** and incorporated herein.

22.     On March 17, 2020, purporting to act under the authority of various Kentucky statutes and Executive Order 2020-215, the Cabinet for Health and Family Services issued an Order stating that "all public-facing businesses that encourage public congregation or, that by the nature of the service to the public, cannot comply with CDC guidelines concerning social distancing, shall cease all in-person operations." A true and correct copy of the March 17, 2020 Order is attached hereto as **EXHIBIT C** and incorporated herein.

23.     The March 17 Order permitted numerous businesses, including "food, food processing, agriculture, industrial manufacturing, feed mills, construction, trash collection, retail, grocery and consumer goods, home repair/hardware and auto repair, pharmacy, and other medical facilities, biomedical and healthcare, post offices, insurance, banks, gas stations, laundromats, veterinary clinics and pet stores, warehousing, storage, and distribution, public transportation, and hotel and commercial lodging," to "remain open . . . but must **to the extent practicable** implement Centers for Disease Control guidance" on social distancing and sanitary practices. EXHIBIT C at 1–2 (emphasis added).

24.     On March 19, 2020, purporting to act under the authority of various Kentucky statutes and Executive Order 2020-215, the Cabinet for Health and Family Services issued an order stating that "[a]ll mass gatherings are hereby prohibited." A true and correct copy of the March 19, 2020 Order is attached hereto as **EXHIBIT D** and incorporated herein.

25.     In the March 19 Order, the Commonwealth purported to prohibit "any event or convening that brings together groups of individuals, including, but not limited to, community,

civic, public, leisure, **faith-based**, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." EXHIBIT D at 1 (emphasis added).

26.    While purporting to prohibit "[a]ll mass gatherings," the March 19 Order provides blanket exemptions for non-faith-based events or locations "where large numbers of people are present" including "airports, bus and train stations, medical facilities, **libraries, shopping malls and centers** . . . office environments, factories, [and] **retail or grocery stores**." EXHIBIT D at 1 (emphasis added).

27.    On March 22, 2020, Governor Beshear issued Executive Order 2020-246, which ordered closure of "[a]ll in-person retail businesses that are not life-sustaining" immediately as of March 23, 2020 at 8:00 p.m. A true and correct copy of Executive Order 2020-246 is attached hereto as **EXHIBIT E** and incorporated herein.

28.    Executive Order 2020-246 provided for a large number of so-called life-sustaining businesses, and so-called non-life-sustaining businesses providing "delivery and curbside service," to continue operations so long as appropriate social distancing ("when possible") and hygiene practices were followed, to the extent "practicable." EXHIBIT E at 2 ¶ 4.

29.    Executive Order 2020-246 exempted as life-sustaining businesses "Building Material and Garden Equipment and Supplies Dealers," "Beer, Wine, and Liquor Stores," "General Merchandise Stores, including Warehouse Clubs and Supercenters," and others. EXHIBIT E at 4.

30.    Executive Order 2020-246 thus continued to prohibit religious or "faith-based" gatherings of any kind from occurring in the Commonwealth **regardless of whether social distancing and personal hygiene practices could be maintained**, which were the conditions

under which numerous commercial and non-religious entities "where large numbers of people are present" were exempted without scrutiny or numerical limit.

31.    On March 25, 2020, Governor Beshear issued Executive Order 2020-257, which provided further restrictions on businesses and organizations in the Commonwealth. A true and correct copy of Executive Order 2020-257 is attached hereto as **EXHIBIT F** and incorporated herein.

32.    In Executive Order 2020-257, Governor Beshear provided further instructions and clarifications as to those businesses, entities, and organizations that may remain open if social distancing and personal hygiene practices are followed. EXHIBIT F at 2–4.

33.    Executive Order 2020-257 exempted **19** broad categories of businesses from the mandated closure order, including so-called life-sustaining businesses (e.g., beer, wine, and liquor stores, warehouse clubs, and supercenters) exempted under Executive Order 2020-246 and "[c]arry-out, delivery, and drive-through food and beverage sales." EXHIBIT F at 2–4.

34.    Executive Order 2020-257 thus continued to prohibit religious or "faith-based" gatherings of any kind from occurring in the Commonwealth, regardless of whether such gatherings could meet the social distancing and personal hygiene guidelines pursuant to which exempted commercial and non-religious entities "where large numbers of people are present" were permitted to operate without scrutiny or numeric limitation.

35.    Executive Order 2020-257 also expressly incorporated by reference the "CISA List" (EXHIBIT F at 2 ¶ 1.a), which as of March 28, 2020 referred to the U.S. Department of Homeland Security Cybersecurity and Infrastructure Agency updated guidance document, *Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience In COVID-19 Response*, Ver. 2.0 (Mar. 28, 2020) ("CISA Guidance 2.0"), which significantly

expands beyond 19 the categories of business exempted from the GATHERING ORDERS, and also specifies "Clergy for essential support" as "essential critical infrastructure workers" who are "needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response," and whose ability "to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions." A true and correct copy of the CISA Guidance 2.0 is attached hereto as **EXHIBIT G** and incorporated herein.

36.     Plaintiffs hereinafter refer to Executive Order 2020-215, the March 16, 2020 Order, the March 17, 2020 Order, the March 19, 2020 Order, Executive Order 2020-246, and Executive Order 2020-257 (EXHIBITS A-G) collectively as the "GATHERING ORDERS."

### B.    GOVERNOR BESHEAR'S EXPLICIT STATEMENTS OF HOSTILITY TOWARD RELIGIOUS GATHERINGS.

37.     Despite exempting large categories of commercial and non-religious entities from the mandatory closures specified in the GATHERING ORDERS, even "where large numbers of people are present," the Commonwealth has continued to prohibit faith-based and religious gatherings regardless of their ability to maintain the same social distancing and personal hygiene practices required of exempted businesses and organizations.

38.     On April 10, 2020, Governor Beshear explicitly stated he would target all individuals who decided to engage in their constitutionally protected free exercise of religion and assembly by attending church on Easter Sunday. *See* Kevin Wheatley, *Participants in weekend gatherings must self-quarantine for 2 weeks, Gov. Beshear says*, WDRB.com (Apr. 10, 2020), https://www.wdrb.com/news/participants-in-weekend-gatherings-must-self-quarantine-for-2-weeks-gov-beshear-says/article_01fa77c6-7b72-11ea-90c7-7747ea013459.html.

39.     In his press conference, Governor Beshear informed the Commonwealth that he had instructed the Kentucky State Police to collect the license plate information of all individuals who attended church on Easter Sunday and that such information would be forwarded to the local health departments to impose a mandatory self-quarantine for such individuals. *See* Wheatley, *supra*, ¶ 38.

40.     In an official press release from the Office of the Governor on Good Friday, April 10, 2020, Governor Beshear explicitly threatened Plaintiffs and anyone else who would attend church on Easter Sunday with criminal violations. A true and correct copy of Governor Beshear's Good Friday press release is attached hereto as **EXHIBIT H** and incorporated herein.

41.     Also in his Good Friday press release, discussing individuals attending Easter worship services, Governor Beshear stated that "**[a]nyone attending such a gathering will be notified that it is [sic] misdemeanor violation of the emergency orders issued by the Governor and Kentucky Department for Public Health**." EXHIBIT H at 1 (emphasis added).

42.     Governor Beshear's Good Friday press release again notified people that the Kentucky State Police would be collecting the license plate information of all cars attending a church service on Easter Sunday and that the government would subsequently require a mandatory self-quarantine of 14 days. EXHIBIT H at 2.

**C.     THE COMMONWEALTH'S ENFORCEMENT OF THE GATHERING ORDERS.**

43.     Consistent with Governor Beshear's explicit threats to individuals attending religious services or faith-based gatherings on Easter Sunday, the Kentucky State Police stationed themselves at Maryville Baptist Church on Easter Sunday, April 12, 2020, to enforce the GATHERING ORDERS.

44.     The State Police affixed to cars parked in the Maryville Baptist Church parking lot on Easter Sunday—both occupied and unoccupied (*see* Declaration of David Carr ("Carr Declaration"), attached hereto as **EXHIBIT I**, ¶ 8)—the Commonwealth's "NOTICE" to the cars' owners and occupants, and their household members, of criminal violation of the GATHERING ORDERS by their presence in the parking lot; the requirement for mandatory, household-wide self-quarantine for 14 days on pain of further enforcement; and that disclosure of their attendance at the Easter Service would be subject to public disclosure under Kentucky's open records laws. A true and correct copy of the NOTICE is attached hereto as **EXHIBIT J** and incorporated herein.

45.     The NOTICE states:

### NOTICE

This vehicle's presence at this location indicates that its occupants are present at a **mass gathering** prohibited by Orders of the Governor and the Cabinet for Health and Family Services. As a result, this vehicle's occupants, and anyone they come into contact with, **are at risk of contracting COVID-19**, a respiratory illness that can be severe and lead to death, particularly for older adults and those with underlying heart, lung, kidney, and immunity issues.

**Where people congregate unnecessarily, or fail to follow adequate social distancing practices, they are spreading COVID-19, CREATING SCENES OF EMERGENCY**

**THIS VEHICLE'S LICENSE PLATE NUMBER HAS BEEN RECORDED.***

Employees of the local health department will be contacting those associated with this vehicle with self-quarantine documents, including an agreement requiring this vehicle's occupants and anyone in the household to self-quarantine for **14** days. *Failure to sign or comply with the agreement may result in further enforcement measures.*

**Please be advised that KRS 39A.990 makes it a Class A misdemeanor to violate an emergency order.**

***Records maintained by the Commonwealth are subject to disclosure under the Open Records Act.**

(EXHIBIT J.)

46.    A copy of the NOTICE is reproduced below:



# NOTICE

This vehicle's presence at this location indicates that its occupants are present at a **mass gathering** prohibited by Orders of the Governor and the Cabinet for Health and Family Services. As a result, this vehicle's occupants, and anyone they come into contact with, **are at risk of contracting COVID-19**, a respiratory illness that can be severe and lead to death, particularly for older adults and those with underlying heart, lung, kidney, and immunity issues.

**Where people congregate unnecessarily,
or fail to follow adequate social distancing practices,
they are spreading COVID-19, CREATING SCENES OF AN EMERGENCY**

**THIS VEHICLE'S LICENSE PLATE NUMBER HAS BEEN RECORDED.***

Employees of the local health department will be contacting those associated with this vehicle with self-quarantine documents, including an agreement requiring this vehicle's occupants and anyone in the household to self-quarantine for **14 days**. *Failure to sign or comply with the agreement may result in further enforcement measures.*

Please be advised that KRS 39A.990 makes it a Class A misdemeanor to violate an emergency order.

*Records maintained by the Commonwealth are subject to disclosure under the Open Records Act.

(EXHIBIT J.)

47.    Plaintiff Dr. Roberts received a copy of the NOTICE on his vehicle on Easter Sunday April 12, 2020 in the Maryville Baptist Church parking lot.

48.    Other members and attendees of the Church's Easter Service received copies of the NOTICE on their vehicles—not only those attending in-person, but also **those attending only by "drive-in," where the worship was broadcast on a loudspeaker in the parking lot, and they received copies of the NOTICE on their vehicles even though they remained in their vehicles**.

49.    In addition to Plaintiff Dr. Roberts and other members and attendees of the Church's Easter Service, some members of the media whose vehicles were in the Church's parking lot—who are purportedly exempted from the GATHERING ORDERS' prohibitions (*see* Exhibit F at 3)—also received the NOTICE on their vehicles, despite their not entering the Church building, as depicted below:



50.    The very presence of the visibly uniformed and armed Kentucky State Police and their issuance of the NOTICE caused some members or prospective attendees of the Church's Easter Service to leave the premises and forego attending the Service either in-person or by "drive-in" for fear of criminal repercussions. At least two occupied vehicles left the Church's parking lot immediately upon receiving the NOTICE. (Carr Decl., EXHIBIT I, ¶ 9.)

51.    Kentucky State Police **did not enter the church building at Maryville Baptist Church, did not verify that any occupant of any car in the parking lot was actually inside the**

**church building, and did not witness the social distancing and hygiene practices employed by Maryville Baptist Church inside its building on Easter Sunday**. The Kentucky State Police placed its NOTICE on cars in the Church's parking lot solely because it was a parking lot associated with their targeted religious gathering.

52.     Consistent with Governor Beshear's threats to Plaintiffs for attending services at Maryville Baptist Church on Easter Sunday and subsequent NOTICE from the State Police, Plaintiff Dr. Roberts received a letter from the Commonwealth on April 15, 2020, informing him and his household that they are required to self-quarantine, in their home, for 14 days, solely because Dr. Roberts' car was parked at the Church during its Easter Service. The mandatory quarantine letter purports to require each member of the household to sign an acknowledgement of the mandatory requirements of the quarantine, including reporting a daily temperature reading to the Bullitt County Health Department, not going to work, school, church, or any public place, and not traveling outside Kentucky or Bullitt County without government approval—all on pain of enforcement actions by "public health authorities." A true and correct copy of the Commonwealth's "LETTER" to Dr. Roberts is attached hereto as **EXHIBIT K** and incorporated herein.

53.     The LETTER states that Dr. Roberts received the letter because his vehicle was parked in the parking lot at Maryville Baptist Church on Easter Sunday, April 12, 2020. EXHIBIT K at 1.

54.     The LETTER informs Dr. Roberts that he is "advised to restrict movement to home while self-monitoring with public health supervision for 14 days." EXHIBIT K at 1. It further demands that Dr. Roberts sign the attached acknowledgement "outlining [his] responsibilities during this period of isolation." EXHIBIT K at 1.

55.     The LETTER further informs Dr. Roberts that various Kentucky laws "require [him] to implement control measures that are reasonable and necessary to prevent the introduction, transmission, and spread of the 2019 novel corona virus in this state" and that "**[f]ailure to abide by these requests may result in additional actions by public health authorities.**" EXHIBIT K at 1 (emphasis added).

### D.   MARYVILLE BAPTIST CHURCH'S EASTER SERVICE COMPLIED WITH SOCIAL DISTANCING AND HYGIENE GUIDELINES.

56.     To comply with the CDC and other governmental social distancing and personal hygiene guidelines imposed by the Commonwealth's GATHERING ORDERS (i.e., "where possible" and to the extent "practicable" for exempted businesses), for their Easter Sunday Service Plaintiffs initiated stringent social distancing for the small group inside the 700-seat sanctuary and personal hygiene protocols, and plan to continue such procedures for all church services held during the COVID-19 period.

57.     The Church posted signs on all of its entrances stating that attendees were required to engage in the recommended social distancing while inside the building and supplied hand sanitizer for use by attendees. During the service, Plaintiff Dr. Roberts reiterated compliance with the guidelines for distancing and hygiene, and recommending the elderly and sick to stay at home.

58.     All attendees of the Church's Easter Service complied with the Church's social distancing and hygiene requirements while inside the church building, and most exceeded the requirements by keeping distances of more than 6 feet between them.

59.     The Church's sanctuary can seat up to 700 people, but only a small fraction of that number entered the sanctuary on Easter Sunday.

60.     In addition to the social distancing protocols for those members and attendees who entered the Church building on Easter Sunday, the Church posted signs outside the building noting

that the Church also offered a "drive-in" service for those members and attendees who preferred to stay in their vehicles for the service.

61.    The Church placed a loudspeaker outside the building to facilitate the "drive-in" service and broadcast the audio portion of the service over the loudspeaker for those listening from the parking lot.

62.    Some members and attendees of the Church's Easter Service elected to stay in their vehicles or in the open air of the parking lot to listen to the service on the loudspeaker, as shown below:



63.    No person inside the Church building or in the Church parking lot on Easter Sunday was known or observed to by infected by or symptomatic of COVID-19.

### E.    THE COMMONWEALTH'S UNEQUAL TREATMENT OF COMMERCIAL AND OTHER NON-RELIGIOUS GATHERINGS.

64.    Immediately after the Church's Easter Service, during which the Kentucky State Police had posted the NOTICE on cars in the Church's parking lot, the parking lot of the nearby Walmart was packed with 100–150 vehicles not subject to such treatment, as depicted below:



(Carr Decl., EXHIBIT I, ¶ 11.)

65.

66.    At or about the same time, the parking lot at the nearby Kroger shopping center was likewise packed with over 150 cars not subject to the same treatment as those at Maryville Baptist Church, as depicted below:



(Carr Decl., Exhibit I, ¶ 12.)

67.    In stark contrast to the large parking lots of the local Walmart and Kroger shopping center, which had hundreds of vehicles parked outside at the same time as the Church was hosting its Easter Service, the small parking lot of the Church had relatively few cars in it, as shown below:



(Carr Decl., Exhibit I, ¶ 7.)

68.    Nevertheless, the Church and its attendees were targeted for disparate and discriminatory treatment by the Commonwealth in stationing Kentucky State Police in the Church parking lot and posting the NOTICE on occupied and unoccupied vehicles in the lot.

F.  **LESS RESTRICTIVE ALTERNATIVES TO THE GATHERING ORDERS, NOTICE, AND LETTER ARE AVAILABLE TO THE COMMONWEALTH.**

69.  Despite the Commonwealth's insistence that "faith-based" or religious gatherings cannot continue because they would spread COVID-19, the Commonwealth has failed to consider other, substantially less restrictive alternatives to a total prohibition on religious gatherings.

70.  Like the Commonwealth, the State of Florida has issued stay-at-home executive orders and required the closure of all so-called "non-essential businesses," but managed to do so without unnecessarily discriminating against religious gatherings. On April 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-91, which **included "religious services conducted in churches, synagogues, and houses of worship" as essential businesses able to continue to meet provided social distancing and personal hygiene practices were followed**. A true and correct copy of Florida Executive Order 20-91 is attached hereto as **EXHIBIT L** and incorporated herein.

71.  The State of Indiana has likewise issued stay-at-home executive orders and required the closure of all so-called "non-essential businesses," but managed to do so without unnecessarily discriminating against religious gatherings. Governor Eric. J. Holcomb's Executive Order 20-08 also declared that "[r]eligious facilities, entities and groups, and religious gatherings" are essential businesses and may continue to operate provided they follow appropriate social distancing and personal hygiene practices. A true and correct copy of Indiana's Executive Order 20-08 is attached hereto as **EXHIBIT M** and incorporated herein.

72.  The State of Arizona, in Executive Order 2020-18, classified religious services as essential and also permitted them to meet provided social distancing and personal hygiene practices were followed. A true and correct copy of Arizona Executive Order 2020-18 is attached hereto as **EXHIBIT N** and incorporated herein.

73.     The State of Alabama, in its final Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, issued April 3, 2020, exempts individuals attending religious worship services in person subject to certain requirements and permits "drive-in" worship services. A true and correct copy of the Alabama Order is attached hereto as **EXHIBIT O** and incorporated herein.

74.     The State of Arkansas has likewise exempted "places of worship" from its Executive Order 20-13 imposing restrictions to prevent the spread of COVID-19, provided that they engage in adequate social distancing and personal hygiene practices. A true and correct copy of the Arkansas Executive Order is attached hereto as **EXHIBIT P** and incorporated herein.

75.     The State of Connecticut has similarly shown that other, less restrictive alternatives are available. In Executive Order No. 7N, Governor Ned Lamont permitted religious services to continue to meet, but limited their in-person gatherings to 50 people, as opposed to the six-person limit applicable to other gatherings. A true and correct copy of the Connecticut Executive Order No. 7N is attached hereto as **EXHIBIT Q** and incorporated herein.

76.     Numerous other states have similarly permitted religious gatherings to be treated equally with non-religious gatherings.

77.     As these other states have demonstrated, the government can continue to pursue its objective of preventing the spread of COVID-19 without unnecessarily treating religious gatherings in a discriminatory manner and have numerous other, less restrictive alternatives available to it to do so.

78.     **The Commonwealth has neither tried without success nor considered and ruled out for good reason these less restrictive alternatives**.

79.    The Commonwealth has constitutionally permissible alternatives available, but it has failed to attempt to achieve its purported goals without unnecessarily interfering with constitutionally protected activities.

### G.    PLAINTIFFS' IRREPARABLE INJURY RESULTING FROM THE COMMONWEALTH'S GATHERING ORDERS.

80.    Despite following all social distancing and personal hygiene protocols recommended by the CDC and specified in the Commonwealth's GATHERING ORDERS, Plaintiffs have been explicitly targeted, singled out, and punished for participating in a religious or "faith-based" gathering when gatherings involving numerous commercial or non-religious entities "where large numbers of people are present" are permitted without numeric limitation, and without targeting or punishment by the government.

81.    Members and attendees of the Church have been stigmatized and subjected to adverse employment action by their employers, including immediate furlough and constructive furlough forced by professional ostracization, as a result of merely attending services at the Church, due to the public targeting of faith-based gatherings by Governor Beshear and the specific public targeting of Plaintiffs and enforcement of the GATHERING ORDERS against Plaintiffs by the Kentucky State Police.

82.    As a result of the Commonwealth's GATHERING ORDERS, Plaintiffs have suffered and are suffering irreparable injury by being prohibited from engaging in their constitutionally and statutorily protected rights of free exercise, assembly, and speech.

83.    As a result of the Commonwealth's GATHERING ORDERS, Plaintiffs have suffered and are suffering irreparable injury by being prohibited from engaging in their constitutionally protected rights to be free from government hostility toward religion.

84.     As a result of the Commonwealth's GATHERING ORDERS, Plaintiffs have suffered and are suffering irreparable injury by being deprived of their constitutionally protected rights to equal protection.

85.     As a result of the Commonwealth's NOTICE to Plaintiff Dr. Roberts and other members and attendees of the Church, Plaintiffs have suffered and are suffering irreparable injury by the Commonwealth's threat of criminal sanctions against Dr. Roberts and the Church's members and attendees for merely exercising their constitutionally protected freedoms, and for failing to self-quarantine as a consequence of their merely exercising their constitutionally protected freedoms.

86.     As a result of the Commonwealth's LETTER to Plaintiff Dr. Roberts and to other members and attendees of the Church, following the Commonwealth's NOTICE, imposing a household-wide self-quarantine on each recipient and threatening criminal sanctions for noncompliance, Plaintiffs have suffered and are suffering irreparable injury by the Commonwealth's threat of criminal sanctions against Dr. Roberts and the Church's members and attendees for failing to self-quarantine as a consequence of their merely exercising their constitutionally protected freedoms.

**H.     PLAINTIFFS' ATTEMPTS TO SECURE RELIEF WITHOUT JUDICIAL INTERVENTION WERE IGNORED, AND FURTHER ATTEMPTS TO NOTIFY THE COMMONWEALTH ARE FUTILE AND IMPRACTICAL BEFORE THIS SUNDAY.**

87.     At approximately 9:00 P.M. E.D.T. on April 15, 2020—the same day Plaintiff Dr. Roberts and other members and attendees of the Church received the Commonwealth's LETTER, further enforcing the Commonwealth's NOTICE and GATHERING ORDERS, and prior to the commencement of the instant action—Plaintiffs' counsel sent by e-mail a demand letter to Governor Beshear (c/o La Tasha Buckner, Governor Beshear's Chief of Staff and General

Counsel, Latasha.buckner@ky.gov), Eric Friedlander, Acting Secretary, Kentucky Cabinet for Health and Family Services (Eric.Friedlander@ky.gov), and Andrea Renfrow, Public Health Director, Bullitt County Health Department (Andrea.Renfrow@ky.gov), with a copy to Shawna Kincer, General Counsel, Kentucky State Police (Shawna.Kincer@ky.gov), in which Plaintiffs' counsel demanded, by 2:00 P.M. on April 16, written confirmation that the officials have withdrawn the church gathering bans embodied in the GATHERING ORDERS, will allow individuals to attend church services consistent with social distancing guidelines, and will cease enforcement of any church gathering bans against members and attendees of the Church's services through means such as patrolling the Church's parking lot, issuing the NOTICE, or sending the LETTER. Between 9:30 and 10:00 A.M. on April 16, 2020, Plaintiffs' counsel attempted to reach by telephone each of the primary addressees of the demand letter but was unable to speak to any of them. No written response from any Commonwealth or County official was received by the requested 2:00 P.M. deadline, or at any time prior to the filing of this complaint.

88.    The failure of the Commonwealth's officials to confirm withdrawal or cessation of enforcement of the church gathering ban embodied in the GATHERING ORDERS and applied to Plaintiffs and other members and attendees of the Church through the NOTICE and the LETTER shows that Plaintiffs' irreparable injury to their constitutionally protected freedoms is ongoing.

89.    The failure of the Commonwealth's officials to respond to Plaintiffs' communication also shows that notice and an opportunity to respond to this lawsuit cannot be effectuated, and would be futile, prior to this Sunday's worship activities at the Church, when the Commonwealth will again interfere with the constitutional liberties of Plaintiffs absent a temporary restraining order from this Court.

## CONSTITUTIONAL CLAIMS

### COUNT I — THE GATHERING ORDERS VIOLATE
### PLAINTIFFS' RIGHTS TO FREEDOM OF ASSEMBLY
### UNDER THE FIRST AMENDMENT.

90.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

91.     The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the Commonwealth from abridging the right of the people peaceably to assemble.

92.     The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to assemble.

93.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

94.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

95.     Defendant lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of differential standards for churches and faith-based gatherings than those applicable to so-called "life-sustaining" businesses or non-religious entities.

96.     The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

97.     The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

98.     The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

99.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to assemble.

100.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Beshear and his designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free assembly.

101.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their gathering prohibitions to only certain businesses or organizations deemed "non-life-sustaining."

102.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Plaintiffs.

103.    On their face and as applied, the GATHERING ORDERS' violation of Plaintiffs' right to free assembly have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

104.    Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT II — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHTS TO FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT

105.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

106.    The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the Commonwealth from abridging Plaintiffs' freedom of speech.

107.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' speech.

108.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

109.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

110.    The Commonwealth lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to exempted businesses and non-religious entities.

111.    The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

112.    The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

113.    The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

114.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected speech.

115.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Beshear and his designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free speech.

116.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed non-life-sustaining.

117.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of Plaintiffs.

118.    On their face and as applied, the GATHERING ORDERS' violation of Plaintiffs' rights to free speech have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

119.    Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT III — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHTS TO FREE EXERCISE OF RELIGION UNDER THE FIRST AMENDMENT

120.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

121.    The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the Commonwealth from abridging Plaintiffs' rights to free exercise of religion.

122.    Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

123.    Plaintiffs have sincerely held religious beliefs, rooted in Scripture's commands (e.g., Hebrews 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

124.    The GATHERING ORDERS, on their face and as applied, target Plaintiffs' sincerely held religious beliefs by prohibiting faith-based gatherings.

125.    The GATHERING ORDERS, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the Commonwealth's imposed value system.

126.    The GATHERING ORDERS, on their face and as applied, place Plaintiffs in an irresolvable conflict between compliance with the GATHERING ORDERS and their sincerely held religious beliefs.

127.    The GATHERING ORDERS, on their face and as applied, put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of Believers.

128.    The GATHERING ORDERS, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Plaintiffs.

129.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

130.    The Commonwealth lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to exempted businesses or non-religious entities.

131.    Even if the GATHERING ORDERS' restriction on faith-based gatherings were supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

132.    The GATHERING ORDERS, on their face and as applied, fail to accommodate Plaintiffs' sincerely held religious beliefs.

133.    The GATHERING ORDERS, on their face and as applied, specifically target Plaintiffs' sincerely held religious beliefs and set up a system of individualized exemptions that permits certain other similarly situated businesses or non-religious entities to continue operations under certain guidelines while prohibiting faith-based gatherings, such as Plaintiffs' church and religious gatherings, from operating with similar guidelines.

134.    The GATHERING ORDERS, on their face and as applied, constitute an overt religious gerrymander.

135.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

136.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

## COUNT IV — THE GATHERING ORDERS VIOLATE
## THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

137.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

138.    The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

139.    The Establishment Clause also prohibits excessive government entanglement with religion.

140.    The Establishment Clause also prohibits the government from showing hostility towards religion and prohibits showing favoritism towards one religious sect over another or between non-religion and religion.

141.    The GATHERING ORDERS, on their face and as applied, permit the Commonwealth to display impermissible hostility towards religious or faith-based gatherings.

142.    The GATHERING ORDERS, on their face and as applied, impermissibly show favoritism towards certain non-religious gatherings over religious or faith-based gatherings.

143.    The GATHERING ORDERS, on their face and as applied, violate the Establishment Clause because they excessively entangle the government with religion.

144.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

145.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT V — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO EQUAL PROTECTION UNER THE FOURTEENTH AMENDMENT

146.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

147.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to equal protection under the law.

148.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional abridgement of Plaintiffs' right to equal protection under the law, are not neutral, and specifically target Plaintiffs and other faith-based gatherings for unequal treatment.

149.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional abridgment of Plaintiffs' right to equal protection because they permit the Commonwealth to treat Plaintiffs differently from other similarly situated businesses and non-religious entities on the basis of the content and viewpoint of Plaintiffs' gatherings.

150.    The GATHERING ORDERS, on their face and as applied, impermissibly discriminate between certain non-religious gatherings and religious or faith-based gatherings.

151.    Defendant lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to exempted businesses or non-religious entities.

152.    The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

153.    The GATHERING ORDERS, on their face and as applied, do not have a rational basis.

154.    The GATHERING ORDERS, on their face and as applied, are irrational and unjustifiable and impose irrational and unjustifiable restrictions on Plaintiffs' religious or faith-based gatherings.

155.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

156.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT VI — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO A REPUBLICAN FORM OF GOVERNMENT UNDER THE GUARANTEE CLAUSE OF ARTICLE IV, § 4 OF THE UNITED STATES CONSTITUTION

157.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

158.    Article IV, § 4 of the United States Constitution requires the United States to guarantee to every citizen in the nation a republican form of government.

159.    The Guarantee Clause's distinguishing feature is that the republican form of government that it guarantees is the right of the people to choose their own governmental administration and pass their own laws.

160.    As interpreted by the federal judiciary and prominent scholars, the Guarantee Clause mandates that the federal government guarantee a form of government for all citizens in which supreme power resides in a body of citizens entitled to vote and exercised by elected officers responsible to such citizens.

161.    The GATHERING ORDERS' express, unilateral, and unequivocal exercise of executive authority purportedly over the constitutional rights of Plaintiffs deprive Plaintiffs of the right to select their own government administration, pass their own laws, and maintain a government administration directly responsible to the people, including by laws that are enacted by the legislature in constitutional recognition of the separation of powers.

162.    The impermissible exercise of exclusive and unaccountable executive authority violates the Guarantee Clause of the United States Constitution.

163.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

164.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT VII — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO ASSEMBLE UNDER SECTION 1 OF THE BILL OF RIGHTS OF THE KENTUCKY CONSTITUTION

165.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

166.    Section 1 of the Bill of Rights of the Kentucky Constitution gives all men the "inherent and inalienable" right "of assembling together in a peaceable manner for their common good."

167.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to assemble.

168.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

169.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

170.    The Commonwealth lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to other so-called "non-life-sustaining" businesses or services.

171.    The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

172.    The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

173.    The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

174.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to assembly.

175.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Beshear and his designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free assembly.

176.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed non-life-sustaining.

177.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Plaintiffs.

178.    On their face and as applied, the GATHERING ORDERS' violation of Plaintiffs' rights to free assembly have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

179.    Plaintiff have no other adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT VIII — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO FREE SPEECH UNDER SECTION I OF THE BILL OF RIGHTS OF THE KENTUCKY CONSTITUTION

180.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

181.    Section 1 of the Bill of Rights of the Kentucky Constitution gives all men the "inherent and inalienable" right of "freely communicating their thoughts and opinions."

182.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' speech.

183.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

184.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

185.    The Commonwealth lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "non-life-sustaining" businesses or services.

186.    The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

187.    The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

188.    The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

189.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected speech.

190.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Beshear, to apply or not apply the GATHERING ORDERS in a manner to restrict free speech.

191.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed non-life-sustaining.

192.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of Plaintiffs.

193.    On their face and as applied, the GATHERING ORDERS' violation of Plaintiffs' rights to free speech have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

194.    Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT IX — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO FREE EXERCISE AND ENJOYMENT OF RELIGION UNDER SECCTIONS 1 AND 5 OF THE BILL OF RIGHTS OF THE KENTUCKY CONSTITUTION

195.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

196.    Section 1 of the Bill of Rights of the Kentucky Constitution states that all men have the "inherent and inalienable" right of "worshipping Almighty God according to the dictates of their consciences."

197.    Section 5 of the Bill of Rights of the Kentucky Constitution states that

> No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. **No human authority shall, in any case whatever, control or interfere with the rights of conscience**.

(Emphasis added.)

198.    Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

199.    Plaintiffs have sincerely held religious beliefs, rooted in Scripture's commands (e.g., Hebrews 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the

entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

200.    The GATHERING ORDERS, on their face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting faith-based gatherings.

201.    The GATHERING ORDERS, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the Commonwealth's imposed value system.

202.    The GATHERING ORDERS, on their face and as applied, place Plaintiffs in an irresolvable conflict between compliance with the GATHERING ORDERS and their sincerely held religious beliefs.

203.    The GATHERING ORDERS, on their face and as applied, put substantial pressure on Plaintiffs to violate its sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of Believers.

204.    The GATHERING ORDERS, on their face and as applied, purport to exercise control and interference with Plaintiffs' constitutionally protected rights of conscience.

205.    The GATHERING ORDERS, on their face and as applied, purport to prohibit Plaintiffs from worshipping Almighty God in accordance with the dictates of their conscience.

206.    The GATHERING ORDERS, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily targets the religious beliefs, speech, assembly, and viewpoint of Plaintiffs.

207.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

208.    The Commonwealth lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to exempted businesses and non-religious entities.

209.    Even if the GATHERING ORDERS' restriction on faith-based gatherings was supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

210.    The GATHERING ORDERS, on their face and as applied, fail to accommodate Plaintiffs' sincerely held religious beliefs.

211.    The GATHERING ORDERS, on their face and as applied, specifically target Plaintiffs' sincerely held religious beliefs and set up a system of individualized exemptions that permits certain other similarly situated businesses or non-religious entities to continue operations under certain guidelines while prohibiting faith-based gatherings, such as Plaintiffs' church and religious gatherings, from operating with similar guidelines.

212.    The GATHERING ORDERS, on their face and as applied, constitute a religious gerrymander.

213.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

214.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

### COUNT X — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHT TO HAVE LAWS SUSPENDED ONLY BY THE KENTUCKY LEGISLATURE

215.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

216.    Section 15 of the Bill of Rights of the Kentucky Constitution states that "[n]o power to suspend laws shall be exercised unless by the General Assembly."

217.    The GATHERING ORDERS' express, unilateral, and unequivocal exercise of executive authority purportedly over the constitutional rights of Plaintiffs deprive Plaintiffs of the right to select their own government administration, pass their own laws, and maintain a government administration directly responsible to the people, including by laws that are enacted by the legislature.

218.    The impermissible exercise of such executive authority violated the Kentucky Constitution by purporting to suspend constitutional rights and laws of the Commonwealth without legislative exercise of such suspension.

219.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

220.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

**STATUTORY CLAIMS**

**COUNT XI — THE GATHERING ORDERS VIOLATE
PLAINTIFFS' RIGHTS UNDER THE
RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT**

221.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

222.    The Religious Land Use and Institutionalized Persons Act ("RLUIPA") states that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). If the government does impose such a restriction, it must then demonstrate that such a burden on the religious assembly is supported by a compelling interest and is the least restrictive means to further that alleged interest.

223.    RLUIPA further mandates that no government "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

224.    RLUIPA further states that "[n]o government shall impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3).

225.    Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

226.    Plaintiffs have sincerely held religious beliefs, rooted in Scripture's commands (e.g., Hebrews 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the

entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

227.    The GATHERING ORDERS, on their face and as applied, target Plaintiffs' sincerely held religious beliefs by prohibiting faith-based gatherings.

228.    The GATHERING ORDERS, on their face and as applied, impermissibly and substantially burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the Commonwealth's imposed value system.

229.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

230.    The Commonwealth lacks a compelling interest in the GATHERING ORDERS' application of different standards for churches and faith-based gatherings than those applicable to exempted businesses and non-religious entities.

231.    Even if the GATHERING ORDERS' restrictions on faith-based gatherings was supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

232.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

233.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

## COUNT XII — THE GATHERING ORDERS VIOLATE PLAINTIFFS' RIGHTS UNDER THE KENTUCKY RELIGIOUS FREEDOM RESTORATION ACT

234.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–89 above.

235.    The Kentucky Religious Freedom Restoration Act, Ky. Rev. Stat. § 446.350 [hereinafter KRFRA], prohibits the government from substantially burdening a person's exercise of religion.

236.    If the government does burden an individual's exercise of religion, it must demonstrate "by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest." KRFRA.

237.    Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

238.    Plaintiffs have sincerely held religious beliefs, rooted in Scripture's commands (e.g., Hebrews 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

239.    The GATHERING ORDERS, on their face and as applied, target Plaintiffs' sincerely held religious beliefs by prohibiting faith-based gatherings.

240.    The GATHERING ORDERS, on their face and as applied, impermissibly and substantially burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change

those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the Commonwealth's imposed value system.

241.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

242.    The Commonwealth lacks a compelling interest in the GATHERING ORDERS' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "non-life-sustaining" businesses or services.

243.    Even if the GATHERING ORDERS' restriction on faith-based gatherings was supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

244.    The Commonwealth has not and cannot demonstrate clear and convincing evidence of a compelling government interest in treating Plaintiffs' faith-based or religious gatherings differently than gatherings of exempted businesses and non-religious entities.

245.    The Commonwealth has not and cannot demonstrate by clear and convincing evidence that it has deployed the least restrictive means to further its purported compelling interest.

246.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

247.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the Commonwealth as hereinafter set forth in their prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.      That the Court issue a Temporary Restraining Order restraining and enjoining Governor Beshear, all Commonwealth officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with the GATHERING ORDERS or any other order to the extent any such order prohibits drive-in church services at the Church, or in-person church services at the Church if the Church meets the social distancing and hygiene guidelines pursuant to which the Commonwealth allows so-called "life-sustaining" commercial and non-religious entities (e.g., beer, wine, and liquor stores, warehouse clubs, and supercenters) to accommodate large gatherings of persons without numerical limit.

B.      That the Court issue a Preliminary Injunction pending trial, and a Permanent Injunction upon judgment, restraining and enjoining Governor Beshear, all Commonwealth officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing the GATHERING ORDERS so that:

   i.      The Commonwealth will not apply the GATHERING ORDERS in any manner as to infringe Plaintiffs' constitutional and statutory rights by discriminating against their right to assembly, speech, free exercise of religion, equal protection, and all other constitutional and statutory rights outlined herein;

   ii.     The Commonwealth will apply the GATHERING ORDERS in a manner that treats Plaintiffs' faith-based gatherings on equal terms as gatherings for or in so-called life-sustaining businesses and non-religious entities;

iii.    The Commonwealth will permit faith-based gatherings so long as they comply with the same social distancing and personal hygiene recommendations pursuant to which the Commonwealth allows so-called "life-sustaining" commercial and non-religious entities (e.g., beer, wine, and liquor stores, warehouse clubs, and supercenters) to accommodate large gatherings of persons without numerical limit under the GATHERING ORDERS;

iv.    The Commonwealth will permit Plaintiffs the opportunity to comport their behavior to any further limitations or restrictions that the Commonwealth may impose in any future modification, revision, or amendment of the GATHERING ORDERS or similar legal directive;

v.    The Commonwealth will cease issuing notices of criminal violation and mandatory, household-wide self-quarantine on the vehicles in the parking lot of Plaintiff Maryville Baptist Church, such as the NOTICE issued by the Kentucky State Police on the vehicles in the Church's parking lot on Easter Sunday, solely because such vehicles are on the Church's premises during a religious gathering;

vi.    The Commonwealth will revoke the self-quarantine LETTER issued to Plaintiff Dr. Roberts; and

vii.    The Commonwealth will not bring any further enforcement, criminal, or other public health actions against Plaintiffs as threatened in Governor Beshear's public statements, in the NOTICE, and in the LETTER.

C.    That the Court render a Declaratory Judgment declaring that the GATHERING ORDERS both on their face and as applied by the Commonwealth are unconstitutional under the United States Constitution and Kentucky Constitution, and further declaring that:

      i.    The Commonwealth has violated Plaintiffs' rights to freedom of assembly by impermissibly prohibiting faith-based gatherings;

      ii.    The Commonwealth has violated Plaintiffs' rights to freedom of speech by impermissibly prohibiting faith-based gatherings;

      iii.    The Commonwealth has violated Plaintiffs' rights to free exercise of religion by impermissibly prohibiting faith-based gatherings, substantially burdening their sincerely held religious beliefs, applying criteria that are neither neutral nor generally applicable to religious and non-religious gatherings, by establishing a religious gerrymander against faith-based gatherings, and by establishing a system of individualized exemptions that exclude similarly situated non-religious gatherings from the prohibitions applicable to Plaintiffs' religious and faith-based gatherings;

      iv.    The Commonwealth has violated Plaintiffs' rights to equal protection of the laws by impermissibly prohibiting faith-based gatherings, and by applying criteria that treats faith-based gatherings in a discriminatory and dissimilar manner as that applied to various non-religious gatherings;

      v.    The Commonwealth has violated the Establishment Clause by impermissibly demonstrating hostility towards faith-based gatherings and by impermissibly showing favoritism to certain non-religious gatherings;

vi.    The Commonwealth has violated the Guarantee Clause by impermissibly exercising executive authority in an unconstitutional manner;

vii.    The Commonwealth has violated the Religious Land Use and Institutionalized Persons Act by substantially and impermissibly burdening Plaintiffs' sincerely held religious beliefs and treating unequally as compared to other non-religious assemblies or institutions, by imposing draconian prohibitions on Plaintiffs' sincerely held religious beliefs without a compelling government interest, and without deploying the least restrictive means to achieve any permissible government interest; and

viii.    The Commonwealth has violated the Kentucky Religious Freedom Restoration Act by substantially and impermissibly burdening Plaintiffs' sincerely held religious beliefs and treating them unequally as compared to other non-religious assemblies or institutions, by imposing draconian prohibitions on Plaintiffs' sincerely held religious beliefs without a compelling government interest, without deploying the least restrictive means to achieve any permissible government interest, and without providing clear and convincing evidence that its GATHERING ORDERS are supported by a compelling government interest and deploy the least restrictive means.

D.    That the Court award Plaintiffs nominal damages for the violation of Plaintiffs' constitutional rights.

E.     That the Court adjudge, decree, and declare the rights and other legal relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

F.     That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

G.     That the Court declare Plaintiffs are prevailing parties and award Plaintiffs the reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988.

H.     That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

DATED this April 17, 2020.

Respectfully submitted,

s/ Horatio G. Mihet
Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@LC.org
hmihet@LC.org
rgannam@LC.org
dschmid@LC.org

*Attorneys for Plaintiffs*

*Pro hac vice applications pending

## **<u>VERIFICATION</u>**

I, Dr. Jack Roberts, am over the age of eighteen years, the Founder and Senior Pastor of Maryville Baptist Church, and am one of the Plaintiffs in this action. The statements and allegations that pertain to me and/or Plaintiff Maryville Baptist Church or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the Commonwealth of Kentucky, that the foregoing statements are true and correct to the best of my knowledge.

Executed this April 17, 2020.

s/ Dr. Jack Roberts
Dr. Jack Roberts